No. 23,473.

THE AMERICAN STATE BANK v. WALTER E. WILSON, as Bank Commissioner (FRANKLIN H. FOSTER, substituted), *Defendant.*

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Deposits Protected by State Guaranty Fund.* A deposit which will be protected by the state guaranty fund may be accomplished by giving the bank credit in another bank in exchange for a certificate of deposit.

2. SAME—*Certain Certificates of Deposit Not Claims Against the State Guaranty Fund.* It is held that in the present case certificates of deposit issued by a bank which has since been closed are not claims against the guaranty fund because of other circumstances tending to show that the transaction which they evidenced was not a deposit within the meaning of the statute and because the bank paid a bonus of ten per cent for the money it received.

State Bank v. Bank Commissioner.

3. SAME—*Certificate of Deposit Bearing Higher Rate of Interest than the Maximum Allowed Not Protected by the Guaranty Fund.* A certificate of deposit bearing a higher rate of interest than the maximum allowed by the bank commissioner is not within the protection of the guaranty fund. And the payment by the bank of a bonus to obtain a deposit bearing such maximum is equivalent to contracting for a higher rate.

4. SAME—*Certificate of Deposit with Personal Indorsement Not Protected by State Guaranty Fund.* Where the payee of a certificate of deposit requires the president of the bank to endorse it personally before agreeing to take it, such certificate is "otherwise secured" within the meaning of that term as used in the statute, and is not entitled to the protection of the guaranty fund, notwithstanding such security proves fruitless.

5. SAME—*Certificate of Deposit—Right of An Innocent Purchaser Thereof to Participate in the Guaranty Fund.* The evidence is held to show an issuance of a series of certificates of deposit to the payee and their sale by him to a bank, rather than an issuance of the certificates to the bank through negotiations carried on by him as an agent or broker. Where a certificate of deposit is issued under such circumstances that it is not within the protection of the guaranty fund, there being nothing on its face, however, to show that fact, its transfer to an innocent purchaser will not alter its character in that regard.

6. SAME. Where a person obtains from a bank a certificate of deposit under such circumstances that it is not protected by the guaranty fund, being led to do so by the bank commissioner telling him that it was entitled to that protection, the statement being due to a mistaken view of the law or ignorance of a fact known to the prospective investor, such conduct of the bank commissioner does not preclude him from challenging the validity of the certificate as a claim against the fund when called upon to take official action in the matter.

7. SAME. Where money paid to the bank for a certificate of deposit issued under the circumstances stated in the preceding paragraph is used to pay claims against the bank which otherwise would have been chargeable against the guaranty fund, that fact does not entitle the holder to be reimbursed out of that fund.

Original proceeding in mandamus. Opinion filed February 11, 1922. Writ denied.

*Earl Blake, Chester I. Long, Austin M. Cowan, Claude I. Depew,* and *Forest D. Siefkin,* all of Wichita, for the plaintiff.

*Richard J. Hopkins,* attorney-general, *John G. Egan,* assistant attorney-general, *J. B. Larimer, A. A. Godard, Arthur J. Myers, Robert Stone, George T. McDermott* and *Robert L. Webb,* all of Topeka, for the defendant.

The opinion of the court was delivered by

MASON, J.: The American State Bank of Wichita, as the holder of ten certificates of deposit for $5,000 each, issued by the Kansas State Bank of Salina, which is insolvent and has been closed since May 26, 1919, being now in the hands of a receiver, brought this proceeding seeking by mandamus to compel the state bank commissioner to issue to it as a depositor in such insolvent bank certificates payable so far as may be necessary out of the bank depositors' guaranty fund, as provided by the statute. (Gen. Stat. 1915, § 598.)

The allegations of the alternative writ were denied and the Honorable Charles L. Hunt was appointed commissioner to take testimony and report his findings of fact and conclusions of law thereon. The commissioner found against the plaintiff and recommended the denial of the writ. The cause is submitted upon the evidence and the commissioner's report with the objections of one party or the other to portions thereof.

The statute creating the bank depositors' guaranty fund contains these provisions:

"All deposits not otherwise secured shall be guaranteed by this act. The guaranty as provided for in this act shall·not apply to a bank's obligation as endorser upon bills rediscounted, nor to bills payable, nor to money borrowed from its correspondents or others." (Gen. Stat. 1915, § 600.)

The corresponding provisions of the original act were:

"Deposits which do not bear interest and the following deposit only shall be guaranteed by this act: Time certificates not payable in less than six months from date, and not exceeding more than one year, bearing interest at not to exceed three per cent per annum and on which interest shall cease at maturity. . . . Deposits which are primarily rediscounts or money borrowed by the bank, and all deposits otherwise secured, shall not be guaranteed by this act." (Gen. Stat. 1909, § 542.)

It is contended that the plaintiff has no valid claim against the guaranty fund for these reasons:

1. Its certificates of deposit were received on account of a credit given on its books, no money having actually been deposited in the Salina bank.

2. Apart from the consideration just stated the transaction in which the certificates were received did not amount to the making of a deposit in the Salina bank but rather to a loan of money to it.

3. If what was done is regarded as amounting to a deposit of money in the Salina bank the bank paid a higher rate of interest than 4 per cent, the maximum approved by the bank commissioner.

4. The certificates of deposit by virtue of having a personal endorsement were otherwise secured than by the guaranty fund.

1. The first of these propositions may be disposed of before entering into a detailed statement of fact. Credit in a solvent bank, subject to check or draft, is for all practical purposes equivalent to cash on hand. The solvency of the plaintiff is unquestioned. The effect of its crediting the Salina bank with $50,000 was to place that sum at its disposal, and so far as concerns the objection now under discussion amounted to a deposit within the meaning of the guaranty

act. This is the view taken by Commissioner Hunt, and the court concurs in it.

2. The presentation of the second proposition requires at least a brief summary of the more important facts. The following statement is based largely upon the findings made by Commissioner Hunt, and wherever reliance is placed upon a finding which has been challenged such use of it implies that upon due examination the court reaches the same conclusion from the evidence as he did, a discussion of the objections in detail not being regarded as necessary.

In March, 1919, the Salina bank had for some months been under the supervision of a bank examiner. Its loans were excessive and there had been steady withdrawals of deposits on account of the well-known fact that its financial condition was bad. About the 12th of that month H. J. Lefferdink, its cashier, had an interview with R. E. Crummer, the general manager of the Brown-Crummer Company, of Wichita, which was engaged in buying and selling bonds and other securities, in which he (Lefferdink) sought help in effecting a sale of bonds to be secured by a New Mexico ranch. Crummer declined to entertain the proposition. Lefferdink then told him that the Fourth National Bank of Wichita held certificates of deposit for $50,000 issued by the Salina bank which were about to mature and which it desired to raise money to take up, and proposed that his company make a deposit of that amount with it, receiving therefor its certificates of deposit. Crummer said that if this were done $5,000 would have to be deposited with his company as assurance that the certificates would be paid when due, to be forfeited in the event of a default, but principally to cover the expense for making an investigation of the bank and a fair amount for the services of the company in handling the certificates, any balance to be returned to the person advancing it, who must be some one not interested in or connected with the bank. He also said that assurance would be required from the state bank commissioner as to the standing of the bank's affairs and its condition, and as to the money if advanced being protected by the guaranty fund. The company wrote to the then bank commissioner, Walter E. Wilson, asking information on these matters and received an answer from an assistant commissioner that the return of the ten certificates (which had been drawn and signed on the day of the first negotiations) had been called for, so that a further statement was unnecessary. These certificates were accordingly canceled.

On March 18, 1919, an assistant bank commissioner wired the company that the issue of ten certificates of deposit for $5,000 each had been authorized, but it decided to have nothing further to do with the proposition. On the same day the president of the Salina bank, E. J. Guilbert, called on Crummer and tried to induce the company to reconsider the matter. This was refused, but Crummer, after considerable discussion, said he might undertake the deal personally upon the conditions already named and two additional ones—that Guilbert should endorse the certificates personally and that the Salina bank should maintain a balance of some $20,000 or $25,000 in the American State Bank of Wichita, which was expected to buy the certificates. Crummer again wrote the bank commissioner renewing the inquiries of his former letter. The bank commissioner by his assistant wired and wrote Crummer that the department had authorized the issuance of the ten new certificates; that the Salina bank was operating under the guaranty law, and that the deposit would be fully protected thereby, provided the full amount of $50,000 was credited to the bank and subject to its order. He also gave the same assurance by telephone, adding that the Salina bank was able to meet its obligations, that it was satisfactory to him to have its reserve account maintained in Wichita at the American State Bank, and that Lefferdink and Guilbert were men of good standing. On March 22 a letter was sent from Crummer to the assistant bank commissioner saying that the certificates had been received by the American State Bank and payment for them in the sum of $50,000 would be made upon receipt of telegraphic advice (which was given) that crediting this amount in that bank to the bank commissioner as trustee would be entirely satisfactory and meet with his approval, this being in accordance with instructions from the Salina bank. Crummer laid all his correspondence with the banking department before the American State Bank, which, on March 24, 1919, accepted the certificates, bearing the endorsement of Crummer as well as Guilbert, and credited the bank commissioner with $50,000 as trustee of the Salina bank. Before any agreement had been reached Crummer knew that the Salina bank had been in difficulties, that deposits had been withdrawn "until it was a hard point to reach their loans in connection with the reduction of the deposits"; and that the bank was under the supervision of a representative of the bank commissioner.

About March 24 Crummer received from Kansas City a check

upon a bank of that city signed by L. W. Flack, for $5,000, which he collected and invested in a certificate of deposit which he still retains, claiming the amount for his services in securing the deposit and to cover any expenses in connection therewith if the certificates were not paid when due. Flack was an associate of Felix Broeker, to whose manipulations while cashier the original difficulties of the Salina bank were due. A note of a corporation of which he (Flack) was vice president was discounted by the Salina bank, which sent $5,000 to the credit of Flack at Kansas City. The note was afterwards paid, but only out of the proceeds of mortgaged property which did not pay out, so that the $5,000 was paid to Crummer at the expense of the Salina bank.

At the time of the closing of the Salina bank practically all the $50,000 had been withdrawn from the plaintiff bank upon drafts drawn under the supervision of a representative of the bank commissioner.

The following is a copy of one of the certificates, the others being in the same form:

"Certificate of Deposit
THE KANSAS STATE BANK
SALINA, KANSAS,

MARCH 21, 1919. No. 1333.

"This certifies that R. E. Crummer has deposited in this Bank Five Thousand Dollars   100 Dollars,   $5,000.00 payable to the order of himself in current funds on the return of this certificate properly endorsed three months after date with interest at the rate of 4 per cent per annum for the time specified only. Not subject to check.

53 976                                                    M. M. HANSEN, A. Cashier.

[Endorsed]   E. J. GUILBERT,
                R. E. CRUMMER."

The statute recognizes a difference between a bank's borrowing money on the one hand and on the other receiving it on deposit for a stated time. It is not easy to formulate any specific test by which to determine in a given case into which class a transaction falls. Definitions stated and distinctions made in one connection may not be particularly helpful in another. In *Farrens v. Farmers State Bank*, 101 Neb. 285, the right of several holders of certificates of deposit of a closed bank to share in the guaranty fund was contested on the ground that the transaction which they evidenced was a loan and not a deposit, inasmuch as the payees were officers of the bank. The certificates were held to be charges against the

fund, the scope of the decision being as indicated by these excerpts from the opinion:

"The principal point now urged in the brief of the attorney-general is: These certificates do not represent money placed with the bank as a deposit, but represent merely a loan to the bank. It is admitted that the bank got the benefit of the money. If it was placed in the bank as a deposit, it is protected by the depositors' guarantee fund; while if it was merely a loan to the bank, it is not so protected. . . .

"The evidence shows that prior to the issuance of these certificates each claimant was a director of the Farmers' State Bank of Decatur; that the bank was in need of money; that it borrowed from the Security State Bank of South Omaha $16,000, and pledged as collateral security notes of the face value of $22,000, and of the admitted value of $20,000. Claimants, who were not experienced bankers or business men, each borrowed from the Security State Bank $7,500, then deposited this amount with the Farmers' State Bank of Decatur, and took as evidence thereof the certificates heretofore mentioned. The Decatur bank then paid off its indebtedness to the Security State Bank and redeemed the paper that had been put up as collateral security. The Decatur bank got the full value for each certificate. Had the money been deposited by some party not an officer or director of the bank, there would be no question as to his right to be listed as a depositor. The attorney-general argues that these parties were merely making a loan to the bank and that the relation of creditor and debtor exists. In a certain sense this is true. . . .

"These certificates are in the usual form. The transaction was such on its face as occurs every day in the banking business. If claimants are to be denied the rights of a depositor, it must be solely because they were directors of the bank.

"As the statute stood at the time of the transaction, an officer was not forbidden to become a depositor, or denied any privilege accorded to others doing business with the bank. The legislature not having denied this privilege, the court cannot. The legislature which has just adjourned has enacted a statute to meet such situations. House Roll No. 201, approved April 19, 1917. The fact that it took such action may be regarded as a legislative construction of the statute, and we may assume that, when our bank act was originally passed, it was not intended to exclude directors from the benefits of the act. If so, claimants fall within its protection. Again, it may be pointed out that the equities of the case are with the claimants. The bank got the benefit of their money; with their money it redeemed its collateral security, which was worth considerably more than the amount for which it was pledged. Not only the bank, but the depositors' guaranty fund, received the benefit of their money, and claimants are still liable for the penalty as stockholders. Indeed, the judgment of the district court directed the receiver to withhold the amount for which they are liable as stockholders. Thus all parties are amply protected and justice is done." (pp. 286, 287.)

It is quite clear, however, that the creation of an obligation on the part of a bank may, within the meaning of the guaranty law, amount

to the borrowing of money although evidenced by an instrument in the form of a certificate of deposit. For illustration, if the Salina bank had owed $50,000 upon a promissory note which it was unable to pay at maturity, and had arranged with its creditor to take up the note and issue in lieu thereof a certificate of deposit payable in three months, there would be little difficulty in saying that the carrying out of this arrangement would be a mere renewal of the loan and not the making of a deposit within the protection of the guaranty fund. That a deposit is made in response to active and personal solicitation is not enough to convert it into a loan, that being a recognized method of increasing deposits. Nor is the mere fact that certificates of deposit are drawn and signed before an agreement to take them has been made. These circumstances, however, taken together have some tendency to characterize the transaction here involved, whatever it may have been called by the parties, as in effect the borrowing of money. The occasion for the bank's seeking the $50,000 at the time of the first application to Crummer or the Crummer Company was stated to be the need of meeting at maturity the certificates of deposit for that amount held by the Fourth National Bank; when Crummer entered into the arrangement it was well known that the Salina bank was in a bad condition financially, and Crummer understood that it had been in difficulties, that a representative of the bank commissioner was supervising its affairs, and that deposits had been withdrawn to an embarrassing extent; the indorsement of the certificates by Guilbert was made a condition of their acceptance. These features of the situation suggest something different from the making of a deposit. Still more effective as a barrier to the plaintiff's claim against the guaranty fund is the fact that in the transaction the Salina bank did not receive $50,000 in cash or its equivalent. Its net receipts were $45,000 in money (or what was the same thing, credit in a solvent bank) and a note of the Flack corporation for $5,000 which was not paid until some time after its maturity and then only in such way as to cause the bank to lose a like amount on another claim. That Crummer announced as a condition of the deal that the $5,000 must be paid by some one not interested in or connected with the Salina bank does not save the plaintiff from the consequences of its having been paid by the bank, although it shows a recognition of the fact that it would not do to have the bank pay a bonus. No explanation appears to have been given to Crummer as

to the sources of the payment nor is any theory apparent upon which it might have been supposed to have been furnished by some one not interested in or connected with the bank, and at all events it actually came from the bank and diminished its resources to that extent. We regard the considerations stated as preventing the transaction from being a deposit in the Salina bank of $50,000 and from creating a liability against the guaranty fund.

In a case arising upon statutory provisions similar to but not identical with our own a decision has been made the force of which is indicated by this paragraph of the syllabus:

"Where money purporting to be a deposit is placed in a state bank, for which the bank issues and delivers to the purported depositor certificates of deposit in terms providing for payment of 5 per cent annual interest, and where by an understanding between the parties the bank pays to such person a bonus of 1 per cent above the lawful rate of 5 per cent interest, *held,* such transaction does not constitute a deposit within the meaning of the bank depositor's guaranty act (Rev. St. 1913, Secs. 280-345), but is a mere loan of money to the bank." (*Iams v. Farmers State Bank,* 101 Neb. 778, syl. ¶ 1.)

3. Even if otherwise the transaction were to be regarded as a deposit within the protection of the guaranty fund, that character would have to be denied it by virtue of the $5,000 payment in effect resulting in the exaction of more than 4 per cent interest. Originally the guaranty fund protected only deposits not bearing interest and time certificates bearing not over 3 per cent. (Gen. Stat. 1909, § 542.) For this provision was substituted that already quoted, including the sentence: "All deposits not otherwise secured shall be guaranteed by this act" (Gen. Stat. 1915, § 600), and at the same time the succeeding section was so amended as to provide that "any officer of any bank who shall pay interest . . . in excess of a rate . . . that shall be approved by the bank commissioner from time to time . . . shall be deemed to be reckless and may be removed from office." (Gen. Stat. 1915, § 601.) The maximum rate for time deposits as fixed by the bank commissioner was 4 per cent. We think it clear that the effect of the amended statute is not to admit deposits to participate in the guaranty fund irrespective of the rate of interest paid, but merely to replace the inelastic limit of 3 per cent by one that should be capable of adjustment to meet changing conditions.

4. Findings were made to this effect with regard to the financial standing of Guilbert: He owned a great quantity of land, cattle and other property, most of it heavily mortgaged, and owed large

sums; at the time of indorsing the certificates he believed himself solvent and probably was solvent; the troubles of the bank, with which he had been connected but a short time, precipitated his failure; his property was sold through foreclosure sales and public auctions during his absence, at much less than its actual worth; his indorsement was of some value when made but became worthless later. Commissioner Hunt concluded that for a claim to be "otherwise secured" within the meaning of that term as used in the guaranty law the security must be reasonably certain and adequate and not merely of conjectural value and availability, and that Guilbert's indorsement did not measure up to this standard. Upon the interpretation of the statute the court reaches a different conclusion. We do not think that in declaring that "all deposits not otherwise secured shall be guaranteed by this act" the legislature had in mind merely that other security than the guaranty fund should be first exhausted, or that to the extent that a deposit was otherwise secured it did not need the protection of the fund. The sentence was used in defining the kind of claims to be covered by the act. This appears from its language and from the earlier provisions which it replaced. Its purpose as we regard it was to classify claims as secured and unsecured, giving the protection of the guaranty only to those otherwise without security, just as in the original act time deposits were protected if they bore three per cent but not if they bore three and a half. Guilbert's indorsement was not volunteered, it was required as a condition of the deal. In making the requirement Crummer spoke of desiring it as an evidence of good faith, but nothing in the negotiation suggested that it was not to impose a personal liability upon Guilbert. The security it afforded was not merely nominal, it was substantial, although it turned out to be fruitless. Guilbert himself testified that he believed himself to be solvent at the time but subsequent facts showed the contrary. His detailed statement of his property and debts, however, indicated solvency. It is not an uncommon thing for a business man's margin of assets over liabilities to be wiped out by a change in market conditions or a need of immediate liquidation. There is hardly any conceivable security that can make the payment of a debt absolutely certain. We hold that by virtue of Guilbert's indorsement the certificates of deposit were otherwise secured and were not within the protection of the guaranty fund.

5. With respect to a claim to participate in the benefits of the guaranty fund we think the plaintiff has no better standing than Crummer would have if he still held the certificates. The transaction cannot be regarded as a deposit by the plaintiff rather than by Crummer. We concur in the finding of Commissioner Hunt that the certificates were issued by the Salina bank to Crummer and purchased of him by the plaintiff, and that they were not issued to the bank through negotiations of Crummer acting as an agent. That it had been arranged in advance that the bank was to take them did not make Crummer any the less a party to the deal. That Crummer did not himself pay the Salina bank for the certificates and then have the plaintiff pay him is of no particular consequence in determining the character of the transaction. No actual money was used in the settlement. The relations of the three parties were adjusted by the short cut of giving the Salina bank credit for $50,-000 on the plaintiff's books, which was the net result to be reached. Even if the plaintiff were to be regarded as an innocent purchaser of the certificates as negotiable instruments its situation would be in no wise bettered so far as relates to a claim against the guaranty fund. The fund protects deposits only. And if no deposit is made, or no deposit within the protection of the guaranty law, the transfer of a certificate cannot impose a liability on the fund. It is true that where a promissory note is freed from a defense by a transfer a mortgage securing it is held to enjoy a like exemption. (19 R. C. L. 356.) But where a certificate of deposit is given under such circumstances that it is not protected by the guaranty fund, although that fact is not indicated by anything on its face, its indorsement to an innocent holder cannot confer that quality upon it.

6. It is urged that the bank commissioner is precluded by the conduct of his predecessor from contesting the validity of the certificates as claims against the guaranty fund. Bank Commissioner Wilson did undertake to assure Crummer that the certificates of deposit would be within its protection, but that was merely an expression of opinion on a question of law. The bank commissioner could not by contract make the fund liable; the matter of liability was determined by the statute. There is nothing to suggest that the bank commissioner knew anything of the payment of the $5,000 bonus, and the contrary is indicated by his statement that the deposit would be protected if the full amount of $50,000 were credited to the Salina bank. Commissioner Hunt found that the bank com-

missioner did not know of this $5,000 payment or of the Guilbert indorsement. Moreover, the guaranty fund is created for the benefit of the public, and the public although not its owner is interested in it. Public rights are not ordinarily subject to loss by estoppel through the conduct of officers. The situation is quite different from that presented where for instance a municipality in resisting the payment of its bonds seeks to dispute the certificate of its officers that the steps necessary for their authorization had been taken, or where an officer undertakes to deny the truth of a record he has himself made.

7. The plaintiff also contends that in any event inasmuch as the money it paid was used in meeting demands which were chargeable against the guaranty fund it should be entitled to reimbursement out of that fund. That use of the money—that is, of the whole or of any definitely ascertained part of it—does not appear to us to have been clearly established. The evidence was merely that it went to the regular needs of the bank and to lessen its guaranteed obligations. But in any event we discover no sufficient basis for subrogation. The plaintiff's money was not taken from it wrongfully. It furnished the money mistakenly supposing it to be secured by the guaranty fund, being led to this belief by the erroneous statement of the bank commissioner to that effect, doubtless due either to an incorrect conception of the law or to ignorance of a material fact known to Crummer—the arrangement for the bonus of $5,000.

The plaintiff places considerable reliance upon *Farish v. State Banking Board,* 235 U. S. 498. There a bank operating under the Oklahoma bank guaranty law without authority sold bonds in its custody and used the proceeds to pay depositors. It was held that the owner of the bonds was subrogated to the rights of the depositors who received his money and that he was entitled to reimbursement out of the guaranty fund. If Crummer or the plaintiff had been fraudulently induced to take the certificates of deposit the cases would probably be parallel. But no intentional misstatement is shown to have been made by the bank commissioner. So far as Crummer or the plaintiff was misled it was upon matters of opinion. They were not entitled to rely upon the advice of the bank commissioner upon a question of law. The fact that neither Crummer nor the plaintiff would have taken the certificates except for the belief, induced by the opinion of the bank commissioner, that they were

entitled if necessary to look to the guaranty fund for payment does not in our judgment create such an equity in their behalf as to give them the right to do so—for that is what it comes to. We do not regard the situation as analogous to those arising where a debt secured by mortgage is paid off under such circumstances as upon equitable grounds in effect to keep the lien alive for the benefit of the person making the payment.

The application for a peremptory writ is denied.